UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                               PLAINTIFF

v.                                                                     CRIMINAL ACTION NO. 3:08CR-119-S

ROBERT FELNER                                                                          DEFENDANT

## MEMORANDUM OPINION

      This matter came before the court for an evidentiary hearing on the motion of the defendant, Robert Felner, to suppress statements made during a June 20, 2008 interview at the University of Louisville College of Education and Human Development ("CEHD")(DN 29). On March 25, 2009, the court heard evidence on this motion. The parties were then given an opportunity to file post-hearing briefs. The matter now stands submitted for decision.

      Felner is under indictment with co-defendant Thomas Schroeder on various counts of mail fraud, money laundering, and tax evasion. On June 20, 2008, an investigation was underway into various activities involving certain grant funds received by the defendants. In furtherance of this investigation, University of Louisville detective Jeffrey Glenn Jewell and United States Postal Inspector Howard Jason Tatum (hereinafter "Jewell," "Tatum," and collectively, " the agents") obtained a search warrant for the dean's suite of offices at the CEHD. In conjunction with the execution of the search warrant, the agents interviewed Felner. The entire process took approximately six hours. Felner takes issue with the manner in which the interview and search were conducted. He urges the court to find that Felner was subject to a custodial interrogation due to the manner and duration of the interview. He contends that Felner should therefore have received the *Miranda* warning prior to the taking of any statement from him. He further contends that he invoked

his right to counsel, and that the invocation of the right was not respected by the agents. We will take these issues in turn.

A person taken into custody or otherwise deprived of his freedom of movement in a significant way must be warned prior to any questioning that he has a right to remain silent and that he has the right to the presence of an attorney. *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). An individual in custody who has expressed the desire to have an attorney present cannot be questioned further until one is made available to him. *Smith v. Illinois*, 469 U.S. 91, 94-95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984). Statements taken in violation of these rules are inadmissible at trial. *Id.*

First, we conclude that the interview of Felner on June 20, 2008 did not constitute a custodial interrogation.

The agents arrived at the CEHD building at approximately 10:15 am, during normal business hours for the School of Education. Both Jewell and Tatum were dressed in plain clothes. They were both armed, but no firearms were visible. The agents entered the lobby of the dean's suite and asked the receptionist if they could speak with Felner. The receptionist contacted Felner's administrative assistant, Becky Newton, who came to the lobby and informed them that Felner was in a meeting. She asked whether this was an important matter, to which Jewell replied that it was. Felner then came to the lobby and escorted the agents to a conference room within the dean's suite. This conference room, denoted Room 124D, was where the interview took place and where Felner remained for the majority of the time while the search was being conducted.

The conference room itself was approximately 300 square feet in size with a large table and 10 to 12 chairs. There were two doors to the conference room – an exterior door leading into a hallway outside the dean's suite, and an interior door into the dean's suite. The doors were closed during the interview. The door leading to the receptionist's area was not locked.

At the outset, Jewell advised Felner that they were there to speak to him concerning his impending departure from the University,[1] and various requests for expenditures of grant money that he had recently submitted. Felner was not initially advised that there was a criminal investigation in progress or that a search warrant for the dean's suite of offices would be conducted that day. He was also not advised that the interview was being recorded by a concealed tape recorder in Jewell's briefcase.

The agents began the interview with Felner at approximately 10:15 am. Jewell sat at the head of the table, with Tatum and Felner sitting on each side across from one another. For the first hour and forty-five minutes of the interview, Felner left the conference room a number of times while offering information in response to Jewell's questions. In one instance he went to his office to retrieve a laptop. Later, when he was unable to access a wireless internet connection in the conference room, Felner and the agents went to the receptionist's desk so that Felner could show the agents a website. During the first almost two hours of their meeting, Felner appeared to the agents to be animated, in charge, and willing to assist them.

After approximately an hour and twenty minutes of discussion, Jewell revealed that Thomas Schroeder, Felner's associate and the principal of the nonprofit National Center on Public Education and Prevention in Rock Island, Illinois,[2] was being served with a subpoena for documents relating to a criminal investigation into the use of grant funds. When this was revealed, Felner stated "Should I get a lawyer?" to which Jewell responds that he was not trying to "trip [Felner] up," and that he was merely "seeking the truth."

Approximately an hour and forty-five minutes into the interview, Jewell requested that interim dean Haselton come to the conference room. Felner and Haselton were both advised that

---

[1] Felner was leaving U of L. Waring Blake Haselton had been appointed interim dean. He began in this capacity on July 1, 2008.

[2] It is alleged in the indictment that this nonprofit entity was used by the defendants to divert grant funds.

the dean's suite, the research suite and the computing resources areas of the building would be searched pursuant to a search warrant obtained in connection with the investigation. Felner was advised that he was not under arrest. Jewell explained that in conducting the search, the agents would be taking charge of these areas of the building. At all times after the search began, the activities of the people on the premises were monitored, and people were escorted to and from the various areas as necessary. Felner was among those escorted to and from the restroom, to obtain a soft drink, to go to his office and his vehicle. At no time did Felner ask if he was free to leave the campus, and that information was not volunteered to him by the agents. There were approximately sixteen agents involved in the execution of the search warrant. During the short time that Haselton was in the conference room with Felner and the agents, Felner appeared to Haselton to be confident and having no trouble answering questions.

During the remaining hours until the search was concluded, Jewell continued to ask Felner questions, but there were also extended periods of time where the agents and Felner simply waited for the search to be concluded.

Jewell began to reveal that the questions he was posing to Felner were in the context of an ongoing investigation. He indicated that he was concerned whether Felner was being truthful. He told Felner that he had ordered Felner's IRS records, that accepting responsibility was important, that he could "help [Felner] out," and that he should be careful not to lie. As Jewell volunteered more information about the criminal investigation, indicating that he had a great deal of information about Felner's activities, Felner began asking whether he was going to be charged, whether he could go to jail, and he indicated that he knew he was "in some trouble." He was told by the agents that they would not be arresting him, and that any decisions about charging him with a crime would be made by the United States Attorney's Office. He asked a number of times whether he should hire a lawyer. He was told that it was his decision and that the agents could not advise him one way or the other on that matter.

At approximately 4:30 pm, Jewell told Felner that a simultaneous interview was being conducted of Thomas Schroeder in Illinois and that Schroeder's version of the facts was not backing up Felner's story. He was told that Schroeder denied any knowledge or involvement in the matters under investigation. Felner responded that he felt like he was being "thrown under a bus," and made an unequivocal request for a lawyer. Jewell immediately responded that he appreciated Felner's cooperation, and Jewell then attempted to find him a phonebook. Unable to locate one, he called his office to have someone look up the phone number of the law firm Felner wished to contact. This occurred almost simultaneously with the conclusion by the other agents of the search. The inventory paperwork was brought to Jewell and he conducted an "exit interview" of Felner. During the exit interview, Felner acknowledged that:

(1) he was told from the outset and repeatedly that he was not under arrest;

(2) he had agreed to sit down and talk with the agents;

(3) he was not threatened or coerced, but he found the "situation" stressful;

(4) the encounter was lengthy, but he was permitted to get a drink, use the restroom, look for computers, and go to his vehicle;

(5) he was treated "nicely;"

(6) when he requested an attorney, he was permitted to attempt to contact one; and

(7) he did not know that he could get up and leave; he assumed that he could not since he was escorted everywhere, but he was told that he was not under arrest and he did not ask whether he could leave.

A "custodial interrogation" has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied*, 118 S.Ct. 1805 (1998), *quoting, Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711. 50 L.Ed.2d 714 (1977). In determining whether Felner was subject to a custodial interrogation we must consider

the totality of the circumstances "to determine how a reasonable man in the suspect's position would have understood the situation." *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000), *quoting, Oregon v. Mathiason*, 97 S.Ct. 711 (1977). Felner was not arrested nor taken into physical custody. There is no question that there was no show of weapons or force, handcuffs, locked doors or the like. Therefore, the court must determine whether Felner was deprived of his freedom of action in a significant way. In so doing, we consider whether a reasonable person in that situation would have believed he was free to terminate the interrogation and leave. Various factors to be considered in this assessment include:

    (1) the purpose of the questioning;

    (2) whether the place of the questioning was hostile or coercive;

    (3) the length of the questioning;

    (4) whether the suspect was informed at the time that the questioning was voluntary, or that he was free to leave or to request the officers to do so;

    (5) whether the suspect possessed unrestrained freedom of movement during questioning;

    (6) whether the suspect initiated contact with the police or voluntarily admitted the officers and acquiesced to their requests to answer some questions. *Crossley*, 224 F.3d at 861, *quoting, Salvo, supra.*

As in *Crossley*, Felner was interviewed at his place of employment during normal business hours. Felner left a meeting to speak with the agents because he was told that it was important. He agreed to speak with the agents and chose the place for the interview. The conference room where the interview took place was a large room located within the dean's suite over which Felner had control in his capacity as dean of the School of Education. There were no weapons drawn or any show of force at any time. He was neither handcuffed nor locked in. Felner was aware of this fact inasmuch as he freely moved around the dean's suite, coming and going from the conference room prior to the commencement of the search.

Once the search began, Felner and others were escorted from place to place. Felner does not contend that he was denied access to any area or that his activities were curtailed by the agents. Felner and Haselton were fully informed as to the procedure to be employed during the execution of the search warrant. They were both informed that the agents would be taking control of the areas to be searched. We find this to be the case despite Felner's statement during the exit interview that he did not know that he could leave because he was being escorted around the premises.

Although the entire process took approximately six hours, Felner was not being questioned for the entire time. Rather, there were long periods of time when Felner and the agents were waiting for the search to be concluded. The tone or tenor of the interview was neither hostile nor coercive. Felner agreed during the exit interview that he was treated "nicely" and was not threatened or coerced. More importantly, a reading of the transcript of the interview in its entirety paints the picture of Felner reacting as he comes to the realization that he and Schroeder are being investigated. His increasing anxiety does not appear to be the result of hostility or threatening behavior on the part of the agents, but rather Felner's own increasing discomfort after learning that he is the subject of an ongoing criminal investigation.

Felner makes much of the "ratcheting up of pressure," as he describes it, by the agents. He notes that the interview began with questions concerning recent requests for expenditures and developed into a more expansive inquiry into Felner's research, his relationship to Schroeder, and his use of grant funds. He contends that when Jewell began asking pointed questions, suggesting that he knew more than Felner thought he knew, and warning Felner not to lie, Jewell created a coercive environment. Thus he contends that the interview amounted to a custodial interrogation. However, stress and anxiety over questioning is not an impermissible by-product of an interview conducted in connection with a criminal investigation. Difficult questions can reasonably be expected to increase the anxiety level in an interview. However, this fact alone does not suggest that the environment of such an interview is necessarily coercive or threatening. Law enforcement

officers would be unable to effectively conduct investigations if a coercive environment were found every time an interviewee became nervous or uncomfortable during questioning. The law does not prohibit tough questioning, even when the questions render a suspect nervous and uncertain. The law does not require agents to befriend suspects. What is prohibited is threatening, coercive, hostile behavior, none of which we find here.

Additionally, we note that the presence of a large number of agents at the scene and the monitoring of the movements of those present during the execution of the search warrant do not establish that the interview occurred in a "police dominated" atmosphere. In *United States v. Axom*, 289 F.3d 496 (8th Cir. 2002), the court found that the presence of nine agents in a small residence executing a search warrant did not establish a "police dominated" environment, since only two agents conducted the interview of the suspect. The court further noted that "a reasonable person in Axom's shoes should have realized that the agents escorted him not to restrict his movement, but to protect themselves and the integrity of the search.

In this case, Jewell took the time to fully explain to Felner and Haselton about the search, that they were going to take charge of the premises in order to conduct the search, and that they may need to move people from place to place during the process. Jewell also clearly stated to Felner that he was not under arrest. The fact that Felner found the "situation" to be stressful is not unexpected. This interview was not a custodial interrogation, despite the stress Felner felt at the questions posed to him and the discomfort in having his domain searched. Felner was not taken into custody and his freedom of movement was not restrained in any significant way. He voluntarily spoke with the agents in the dean's suite of offices. He was informed that he was not under arrest on more than one occasion. Significantly, he was so informed at the time that the search warrant process was explained to him and he was told that the agents would be taking control of the areas to be searched. Felner was permitted to move around at will during the entire process. Prior to the commencement of the search, Felner went to and from the conference room unescorted, at one time going to his

- 8 -

office to retrieve a laptop. He was escorted by an agent during the time the search was being conducted, but his movement was not limited in any way. He was offered food and drink. He stated himself on a number of occasions that he was trying to be cooperative. We conclude that a reasonable person in Felner's shoes would have understood that he was not in custody at the time of the interview.

Felner also contends that he invoked his right to counsel a number of times, but that the interview was not terminated until his last request for counsel was finally acknowledged. A request for counsel must be clear and unambiguous. *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). In *Davis*, the court held that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning...Rather, the suspect must unambiguously request counsel." *Davis*, 114 S.Ct. at 2355. In *Davis*, the suspect stated "Maybe I should talk to a lawyer." The court found the statement to be too ambiguously worded to mandate a cessation of questioning. *See also*, *Ledbetter v. Edwards*, 35 F.3d 1062 (6th Cir. 1994)(statement that it would be nice to have an attorney was ambiguous).

Felner made only one clear and unambiguous request for counsel approximately six hours into the process. At various points Felner asked "Should I get a lawyer?"; "Do I need a lawyer?"; "You don't happen to know a nice attorney do you?"; and "Should I go ahead and get a lawyer?...Am I allowed to?" None of these statements is a clear and unambiguous request for counsel. The Supreme Court stated in *Davis*, *supra*, that

> "[W]e decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him. To recapitulate: We held in *Miranda* that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in *Edwards* that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we

- 9 -

> are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.

*Davis*, 114 S.Ct. at 2356-57.

In sum, viewing the totality of the circumstances, we conclude that Felner was not subject to a custodial interrogation. Further, he did not invoke the right to counsel until the interview was nearly concluded. At the time he requested an attorney, no further questions were asked of him concerning the criminal investigation, and the agents assisted him in attempting to contact counsel. We do not find that the agents violated Felner's rights during the interview of June 20, 2008. Therefore, the motion to suppress statements taken on that date will be denied. A separate order will be entered this date in accordance with this opinion.

**IT IS SO ORDERED.**